IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE SEARCHES/SEIZURES OF:** | ) | |
| | ) | |
| 1) THE BUSINESS PREMISES OF MEDICAL THERAPEUTICS, 4099 WILLIAM PENN HIGHWAY, SUITE 810, MONROEVILLE, PA 15146 ("TARGET LOCATION 1") | ) ) ) ) ) | Magistrate No. 21-909 **[UNDER SEAL]** |
| | ) | Magistrate No. 21-911 |
| 2) THE PERSON OF MARTIN J. MAASSEN | ) ) | **[UNDER SEAL]** |
| 3) THE PERSON OF WILLIAM J. KELLEY | ) ) | Magistrate No. 21-912 **[UNDER SEAL]** |
| 4) THE APPLE IPHONE 11 PRO; BEARING IMSI: 310410227107884 ("MAASSEN PHONE") | ) ) ) ) | Magistrate No. 21-913 **[UNDER SEAL]** |
| 5) THE ANDROID ZTE Z965 CELLULAR TELEPHONE, BEARING IMSI: 310150708663327 ("KELLEY PHONE") | ) ) ) | Magistrate No. 21-914 **[UNDER SEAL]** |

## APPLICATION AND AFFIDAVIT FOR SEARCH AND SEIZURE WARRANTS

I, Whitney A. Seka, Diversion Investigator with the Drug Enforcement Administration ("DEA") being duly sworn, state as follows:

## I. INTRODUCTION

1.      I am a Diversion Investigator for the United States Department of Justice, DEA, Pittsburgh, PA District Office. I have been employed as a Diversion Investigator since January 2016. My responsibilities include the investigation of violations of the Controlled Substances Act (C.S.A.) under Title 21 of the United States Code (U.S.C.). The mission of the Diversion Investigator is to prevent, detect, and investigate the diversion of controlled substances. I have received training through the DEA to become familiar with the C.S.A. and in identifying schemes aimed at diverting controlled substances.

2.      Prior to becoming a Diversion Investigator, your Affiant was employed as an Investigative Assistant for approximately 13 years assigned to various DEA Pittsburgh groups such as the DEA Interdiction Task Force Group 63, DEA Diversion Group 65, and lastly the DEA Task Force Group 62. During your Affiant's tenure as an Investigative Assistant, your Affiant participated in numerous investigations of individuals involved in the unlawful distribution of dangerous controlled substances which included; but not limited to; cocaine, heroin, and marijuana. Through those investigations, your Affiant gained valuable experience and became familiar with the methods utilized by those individuals engaged in the illegal distribution of controlled substances, as well as drug traffickers' patterns of illegal activity. Additionally, your Affiant assisted in the preparation of numerous affidavits prepared by DEA Special Agents and Task Force Officers in support of their federal search and seizure warrants and Title III wiretap affidavits which in turn resulted in the seizure of large quantities of dangerous controlled substances and led to numerous felony drug arrests.

3.      I am knowledgeable of the information that follows in this affidavit from my training and experience; from my conversations with other DEA Diversion Investigators and DEA Special Agents, and DEA Task Force Officers; from Special Agents with the United States Internal Revenue Service (IRS); Special Agents with the Office of Inspector General, Department of Health and Human Services (OIG HHS); from Special Agents with the Pennsylvania Office of the Attorney General; from my own participation in this investigation; from my review of subpoenaed records and other documents; and from other sources of information as further identified in this affidavit.

4.      This application and affidavit are submitted in support of search warrants,

under Rule 41 of the Federal Rules of Criminal Procedure that include the location, person and cell phones described in more detail below.

5.      Your affiant has probable cause to believe that in the Western District of Pennsylvania, from January 1, 2018, and continuing to the present, Dr. Martin J. **MAASSEN** (hereinafter "**MAASSEN**"), William **KELLEY** (hereinafter "**KELLEY**"), and others have committed, and are continuing to commit, the crimes of illegal distribution of controlled substances, and conspiracy to distribute controlled substances in violation of Title 21, U.S.C., Sections 841(a)(1) and 846 and that the properties and persons captioned above contain evidence of those crimes.

## II. PROPERTY, PERSONS AND ITEMS TO BE SEARCHED

a.      **4099 William Penn Highway, Suite 810, Monroeville, PA 15146 (TARGET LOCATION 1).** This is **MEDICAL THERAPEUTICS**' sole place of business, and Dr. Martin J. **MAASSEN**'s registered location, which is considered a controlled premises within the meaning of Title 21, U.S.C., Section 880(a) and Title 21, Code of Federal Regulations (C.F.R.), Section 1316.02 (1) and (2). This location is fully described in ATTACHMENT 1. The items to be searched for and seized are more fully described in ATTACHMENT 1-A.

b.      **The person of Dr. Martin J. MAASSEN. MAASSEN** is licensed in the Commonwealth of Pennsylvania as a Medical Physician and Surgeon under license number MD440320, expiration date December 31, 2022; this license was first issued on June 17, 2010. **MAASSEN** further holds registration with the DEA under Registration number AM8223911, expiration date January 31, 2023.  Details describing **MAASSEN** can be found in ATTACHMENT 2.  The items to be

searched for and seized from **MAASSEN** are more fully described in ATTACHMENT 2-A, which is attached hereto.

    c.    **The person of William KELLEY. KELLEY** is the Managing Director for **MEDICAL THERAPEUTICS**. **KELLEY** is not medically licensed in the Commonwealth of Pennsylvania. Details describing **KELLEY** can be found in ATTACHMENT 3. The items to be searched for and seized from **KELLEY** are more fully described in ATTACHMENT 3-A, which is attached hereto.

    d.    **Apple IPhone 11 PRO, bearing IMSI 310410227107884 (MAASSEN PHONE)** This is the cellular telephone of **MAASSEN**. This property is fully described in ATTACHMENT 4. The items to be searched for and seized are more fully described in ATTACHMENT 4-A.

    e.    **Android ZTE Z965 Cellular Telephone, bearing IMSI 310150708663327 (KELLEY PHONE).** This is the cellular telephone of William **KELLEY**. This property is fully described in ATTACHMENT 5. The items to be searched for and seized are more fully described in ATTACHMENT 5-A.

### III. DEFINITIONS AND APPLICABLE REGULATIONS

    6.    As used in this affidavit and pursuant to Title 21, U.S.C., Section 812 and Title 21, C.F.R., Section 1308.12(b), the following controlled substances are mentioned within this affidavit and are defined as follows:

    a.    Oxycodone is a Schedule II narcotic controlled substance, marketed under various names, including, but not limited to, Roxicodone, OxyContin, and Oxycodone HCl Immediate Release (IR), Percocet, and Roxicet. According to the Physician's Desk Reference (PDR), oxycodone is indicated for treatment of

severe pain.  Oxycodone is an opioid agonist and therefore has abuse potential and risk of fatal overdose.  Oxycodone is associated with significant potential for overdose from respiratory failure or poisoning.  Percocet and Roxicet are combinations of oxycodone with acetaminophen; the combination produces additive analgesia as compared to either agent alone.  When prescribed, oxycodone is commonly in the form of an oral tablet, capsule or oral solution.

b.      Hydrocodone is a Schedule II narcotic controlled substance marketed under various names, including, but not limited to, Vicodin, Lorcet and Norco. According to the PDR, hydrocodone is indicated for the treatment of moderate to moderately severe pain.  Hydrocodone is an opioid agonist and therefore has abuse potential and risk of fatal overdose.  Addiction may occur in patients who obtain hydrocodone illicitly or those appropriately prescribed the drug. When prescribed, hydrocodone usually comes in the form of oral tablet or capsule.

c.      Testosterone is a Schedule III controlled substance marketed under various names, including, but not limited to, Androderm, AndroGel, and Depo-Testosterone. According to the PDR, testosterone is only approved for use in men with low testosterone concentrations due to medical conditions. Testosterone is a hormonal agent, when prescribed, often comes in the form of an injection, transdermal film, topical solution, gel and buccal tablets.

7.      The Pennsylvania Prescription Drug Monitoring Program (PDMP) is a statewide program that collects information about controlled substance prescription drugs that are dispensed to patients within the state.  The PDMP is used as a tool to increase the quality of patient care by giving prescribers and dispensers access to a patient's

controlled substance prescription medication history, which will alert medical professionals to potential dangers for purposes of making treatment determinations; and to aid regulatory and law enforcement agencies in the detection and prevention of fraud, drug abuse and the criminal diversion of controlled substances. Pharmacies are required to report all Schedule II-V dispensed prescriptions to the PDMP no later than the close of the subsequent business day. Your affiant routinely queries the PDMP during her investigations of drug diversion and, as described in this affidavit, your affiant subpoenaed the PDMP controlled substances dispensed by **MAASSEN** from January 1, 2016, through April 8, 2021. Your affiant's review of PDMP data is described later in this affidavit.

8.      According to Title 21, C.F.R. Section 1305.03, with only limited exceptions, either a DEA Form 222 or its electronic equivalent is required for each distribution or transfer of a Schedule I and II controlled substance. According to Title 21, C.F.R. Section 1305.04(a), only persons who are registered with DEA to handle Schedule II controlled substances, may obtain and use DEA Form 222 or issue electronic orders for Schedule II controlled substances.

9.      As defined in Title 21, C.F.R., Section 1300.01, the term "prescription" means an order for medication which is dispensed to or for an ultimate user but does not include an order for medication which is dispensed for immediate administration to the ultimate user. Further, a prescription for a controlled substances must be dated and signed on the date when issued (Title 21, C.F.R., Section 1306.05) The prescription must include the patient's full name and address, and the practitioner's full name, address, and their DEA registration number. The prescription must also include the drug name, strength,

dosage form, quantity prescribed, number of refills authorized (if any), and directions for use.

10.    DEA requires every registered individual practitioner pursuant to Title 21, C.F.R., Section 1304.03 to keep records of controlled substances in Schedule II, III, IV, and V which are dispensed (by the practitioner as opposed to a pharmacist), other than by prescribing or administering in the lawful course of professional practice. Pennsylvania law requires physicians to retain medical records (i.e. patient files) for at least seven years from the last date of service.

11.    As further used in this affidavit and pursuant to Title 21, C.F.R., Section 1306.04(a), "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is imposed primarily on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (Title 21, U.S.C., Section 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

12.    Based on my training and experience as a Diversion Investigator, your Affiant knows that the C.S.A. (Title 21, U.S.C., Section 801 et seq.) establishes a "closed system" of distribution that regulates the movement of controlled substance prescription

medications from importation or manufacture through their delivery to the ultimate user patient via the dispensing, administering, or prescribing pursuant to the lawful order of a practitioner. Prescriptions issued not in the "usual course of professional treatment" are not "prescriptions" for purposes of the C.S.A. and individuals issuing and filling such purported prescriptions are subject to the penalties for violating the C.S.A.'s controlled substances provisions.

## IV. PROBABLE CAUSE THAT OFFENSES HAVE BEEN AND ARE BEING COMMITTED

### A. Background And Targets Of Investigation

13.     In December of 2018, the DEA Pittsburgh District Office (PDO) received a modification of registered address request for the DEA Registration of Dr. Martin J. **MAASSEN** from West Lafayette, IN to Monroeville, PA. An open-source internet search of the proposed registered address identified **MAASSEN** as the Medical Director at "**MEDICAL THERAPEUTICS**", a clinic specializing in male sexual health.

14.     During the modification process, it was discovered that, in approximately 2011, **MAASSEN** was charged in Radcliffe, KY with operating a vehicle under the influence of controlled substances, possession of controlled substances and a traffic violation. During a consent search of his vehicle, numerous bottles of controlled substances were found, to include Roxicet, Hydromet Syrup, and Hydrocodone. Some of those bottles donned prescriptions information to patients of **MAASSEN**, including Gunther Than (hereinafter "Than"), an associate and colleague of **MAASSEN**. During the traffic stop and subsequent arrest, **MAASSEN** stated to law enforcement officers that he was a physician and addicted to the pain medication in his possession. **MAASSEN**

essentially admitted that he had over-prescribed the pain medications. Specifically, he explained that, while the patients listed on the prescription bottles needed the medications he had prescribed, the patients did not need the *quantity* he had prescribed. The drug possession charge was dismissed and the charge of operating a vehicle under the influence was "amended down," resulting in a traffic violation for reckless driving. Therefore, **MAASSEN** was not convicted of an offense involving controlled substances.

15.     **MAASSEN**'s modification request to change his registered address to Pennsylvania was approved on January 3, 2019. Even though the modification of registered location from Indiana to Pennsylvania was not requested until December 21, 2018, and later approved on January 3, 2019, the PA PDMP revealed **MAASSEN** had prescribed controlled substances to numerous patients who had filled their prescriptions in Pennsylvania as early as January 2018.

16.     In January 2020, the DEA PDO initiated this investigation. Subsequently this investigation has been conducted with joint effort by the IRS and the PA OAG. Your affiant initially reviewed the PA PDMP report for **MAASSEN** from approximately 2018 to 2020, which revealed that, while **MEDICAL THERAPEUTICS** was advertised as a men's sexual health clinic, less than 6 percent of **MAASSEN**'s controlled substance prescribing was attributed to steroid-type drugs. Rather, the majority of controlled substances issued by **MAASSEN** in Pennsylvania were found to be large quantities of oxycodone products. Additionally, of those patients receiving controlled substances at the men's sexual health clinic, 38% were female. The PDMP also revealed that **MAASSEN** consistently issued monthly prescriptions to patients for oxycodone 30mg in high quantities of #180 or #240 tablets.

17.    In March 2020, Investigators began to gather information to determine whether **MAASSEN** was residing in the Commonwealth of Pennsylvania, and whether he was actually present in Pennsylvania when he was issuing prescriptions. As part of this inquiry, Investigators utilized a "pole camera" to observe the parking area of **MEDICAL THERAPEUTICS** for the 90-day time frame between September 10, 2020 and December 9, 2020[1]. During that period, **MAASSEN** was observed at **MEDICAL THERAPEUTICS** only between September 22-25, 2020 and October 29-31, 2020.

18.    Utilizing the "pole camera", Investigators were able to identify **MAASSEN**'s registered vehicle as a 2002 Hyundai Accent, bearing Indiana license plate 609LDT.    Your Affiant reviewed License Plate Reader (LPR) system data in Pennsylvania and found that **MAASSEN**'s registered vehicle had frequented the Monroeville, PA area from June 1, 2019 to December 20, 2019. However, between December 20, 2019 and March 2, 2020 (the date the LPR data was received), **MAASSEN**'s known registered vehicle was not captured by the LPR system in Pennsylvania.

19.    Subsequent federal court ordered authorization for the GPS/E911 "ping" physical location data for the **MAASSEN** phone, "pole camera" or physical surveillance and/or LPR queries have shown that **MAASSEN** has been consistently out of the Commonwealth of Pennsylvania since September 2020, only returning to **MEDICAL THERAPEUTICS** for 3 or 4-day spans, once every couple of months[2]. While the aforementioned data and surveillance have shown **KELLEY** regularly reports to

---

[1] The camera recording was active from September 10, 2020 to December 9, 2020 with the exception of the following dates: 10/8/2020 thru 10/12/2020;
[2] Dates **MAASSEN** was at **MEDICAL THERAPEUTICS** since September 2020 per "ping" data and/or "pole camera" surveillance, physical surveillance and LPR queries: 9/22/20; 9/24/20 - 9/25/20; 10/29/20 – 10/30/20; 12/14/20 – 12/17/20; and 2/16/21 – 2/19/21.

**MEDICAL THERAPEUTICS**, the same data shows **MAASSEN** stays at a residence in Conway, AR.

20.     Additional open-source internet searches revealed an internet article posted on [www.globenewswire.com](http://www.globenewswire.com) announcing William **KELLEY**, a retired Pennsylvania State Trooper, as **MEDICAL THERAPEUTICS**' "Managing Director". On March 24, 2020, pursuant to a subpoena, Investigators in this case received recordings of conversations between **KELLEY** and "J.P.," who was detained at the Westmoreland County Jail in connection to probation violations stemming from "J.P.'s" previous drug offense. In a recording, which occurred during a visitation on June 14, 2019, **KELLEY** described the clinic and stated that, in addition to running the clinic, he (**KELLEY**) also assessed patients in **MAASSEN**'s absence at the clinic. **KELLEY** is not medically licensed in the Commonwealth of Pennsylvania.

21.     Recorded surveillance from the aforementioned "pole camera" showed that, between September 10, 2020 and December 9, 2020, on the few occasions when **MAASSEN** *did* travel to **MEDICAL THERAPEUTICS**, he utilized his 2002 Hyundai Accent, bearing Indiana Registration 609LDT and would commonly park on the east side of the building (in the view of the "pole-camera"). This recorded surveillance also revealed that **KELLEY** and Alex Bouchard (hereinafter "Bouchard") (identified as an additional non-medically licensed employee of **MEDICAL THERAPEUTICS**) would utilize high-end Enterprise rental vehicles to travel together to **MEDICAL THERAPEUTICS** and would commonly park on the north side of the building (in the view of the "pole-camera"). From September 10, 2020 to December 9, 2020, **KELLEY** (often accompanied by Bouchard) was recorded by the "pole camera" at **MEDICAL**

**THERAPEUTICS** on a regular basis.

22.     In January 2021, the DEA received an electronic request for DEA Form 222s under the DEA Registration of **MAASSEN**. On February 12, 2020, pursuant to subpoena, Investigators received subscriber information associated with the Internet Protocol address "IP address" of (108.67.57.73). That IP address had been utilized to submit the request for the DEA Form 222s. The IP address is subscribed to Gunther Than at 110 Beaverfork Rd., Conway AR 72032-9515. Therefore, whoever ordered the forms (presumably **MAASSEN**) did so from that address in Conway, AR on January 13, 2021.

### B. Concerns And Complaints By Four Pharmacists Regarding MAASSEN

23.     Over the course of this investigation, the DEA PDO received complaints regarding the prescribing practices of **MAASSEN**. Ultimately, the concerns of Registered Pharmacists (RPH) in Pennsylvania led to "cutting-off," or ceasing to fill **MAASSEN**'s controlled substance prescriptions at Rite Aid Pharmacies and Giant Eagle Pharmacies in November 2020 and February 2021, respectively. The following paragraphs describe those numerous complaints.

24.     On August 12, 2020, Diversion Investigators conducted an interview of a pharmacist in Turtle Creek, PA (hereinafter RPH1) on an unrelated matter. During the interview, Investigators routinely asked RPH1 if he/she had any concerns with any prescribers or patients. RPH1 volunteered concerns with **MAASSEN**'s prescribing habits. RPH1 stated that when RPH1 began seeing prescriptions from **MAASSEN**, RPH1 routinely called **MAASSEN**'s office to get a diagnosis for the patient presenting the prescription. RPH1 stated after making a "visualized determination" of the patients presenting the prescriptions, he/she felt that several of the patients did not appear to have

a need for the drugs they were prescribed by **MAASSEN**. RPH1 stated that he/she no longer fills for new customers who present prescriptions from **MAASSEN**.

25.    On October 20, 2020, a Diversion Investigator and DEA Task Force Officer conducted an interview on an unrelated matter with a pharmacist in Pittsburgh, PA (hereinafter RPH2). During the interview, Investigators routinely asked if RPH2 had any concerns with any prescribers or patients. Unprompted, RPH2 stated that RPH2 was concerned about the prescribing of **MAASSEN**. In particular, one of **MAASSEN**'s patients had presented a prescription for Percocet 10mg. After reviewing the patient's PDMP, RPH2 saw **MAASSEN** had also prescribed OxyContin 40mg, oxycodone 30mg, and oxycodone 15mg to the patient. RPH2 attempted to reach **MAASSEN** at the clinic in Monroeville, PA numerous times, but was unsuccessful. According to RPH2, the patient who presented the prescription contacted **MAASSEN**, and **MAASSEN** then telephoned the pharmacy. **MAASSEN** informed the pharmacist that he was "back home in Indiana". During this call, **MAASSEN** informed the RPH that the diagnosis code for the patient in question was "low back pain". RPH2 said based on concerns that **MAASSEN**'s website listed a specialty of erectile dysfunction and health and wellness, paired with brand name controlled substances request from the patient, RPH2 stopped filling controlled substance prescriptions issued by **MAASSEN**.

26.    On January 6, 2021, Investigators spoke with a pharmacist in Pittsburgh, PA (hereinafter RPH3) who had contacted **MEDICAL THERAPEUTICS** on several occasions in 2020, regarding concerns with respect to prescriptions issued by **MAASSEN** that were presented at the pharmacy. These communications resulted in RPH3's pharmacy's subsequent refusal to fill controlled substance prescriptions issued by

**MAASSEN** to several patients. RPH3 related that, on two occasions, RPH3 had requested "patient notes" from **MEDICAL THERAPEUTICS** to support the need for the strength and quantity of the prescription. RPH3 was provided with "patient notes" which reflected little detail about patient examinations, diagnoses, or reasons for the amounts of the controlled substances prescribed. Further, RPH3 stated that the dates of the notations did not match with the dates on which the prescriptions were purportedly written. RPH3 continued that on one of those occasions, a patient note was sent to the pharmacy by **MAASSEN** via fax from an Indiana state phone number on the same day the prescription for the patient in Pennsylvania was written, suggesting that the prescription was either written by someone else, or pre-written by **MAASSEN**.

27.     On February 1, 2021, Diversion Investigators spoke with a pharmacist in Pittsburgh, PA (hereinafter RPH4) regarding a deceased patient's (hereinafter referred to as "D.L.") oxycodone prescription that was purportedly written and filled after the patient had died. On January 25, 2021, RPH4 was notified that "D.L." had passed away on December 16, 2020. It was at that time RPH4 noticed that a prescription for "D.L." had been written and filled for #120 oxycodone 30mg on December 28, 2020, two weeks after "D.L." had died. Upon realizing this issue, RPH4 contacted **MEDICAL THERAPEUTICS** and requested to speak with **MAASSEN**. The male voice who answered provided the pharmacist with the number for the **MAASSEN PHONE** as the contact number for **MAASSEN**. RPH4 then called the **MAASSEN PHONE**, and asked **MAASSEN** when he last had seen patient "D.L.", for whom he had issued a prescription on December 28, 2020. According to RPH4, **MAASSEN** stated that he last saw patient

"D.L." on December 28, 2020.[3] RPH4 advised Investigators that **MAASSEN** then placed the pharmacist on hold for a "long period of time". According to pen register data on the **MAASSEN PHONE**, during the phone call with RPH4, **MAASSEN** received an incoming call from **MEDICAL THERAPEUTICS** which lasted over two minutes. When **MAASSEN** returned to the phone call with RPH4, he (**MAASSEN**) asked RPH4 if the phone call was in reference to the passing of "D.L." and then stated he (**MAASSEN**) may have not seen "D.L." on December 28, 2020. **MAASSEN** advised RPH4 that it was possible a family member of "D.L." had retrieved the prescription for "D.L." from **MEDICAL THERAPEUTICS** with "ill intent". Before and after this phone call between the pharmacist and **MAASSEN**, pen register data shows text message activity between the **MAASSEN PHONE** and the **KELLEY PHONE**.

### C. Posthumous Filing Of "D.L.'s" Oxycodone Prescription

28.    Investigators have learned that "D.L." died on or about December 16, 2020 from a "combined poisoning of fentanyl, trazodone, citalopram/escitalopam and para-fluorofentanyl[4]". Investigators have also determined that Sara Delio (hereinafter "Delio") was the individual who filled "D.L.'s" oxycodone prescription two weeks after he had died. Investigators acquired video footage of the parking lot of the pharmacy, and of the interior pharmacy counter. Delio utilizes a vehicle that matches the description of the vehicle used by the woman who filled "D.L.'s" prescription on December 28, 2020. While the white female was wearing a face mask, Delio matches the height, body type and general description of the white female who filled "D.L.'s" prescription. In addition,

---

[3] In addition to the fact that patient "D.L." had been deceased for two weeks, ping data for **MAASSEN** on December 28, 2020 showed **MAASSEN** in Conway, AR.
[4] It should be noted that Maassen consistently prescribed a #120 oxycodone 30mg since June 26, 2020 yet at the time the toxicology was performed there was no oxycodone on the toxicology report.

Investigators acquired copies of the electronic signature provided by the white female who retrieved "D.L.'s" prescription, which appears to have been signed "S DELIO". Approximately seven weeks after Delio obtained "D.L.'s" oxycodone prescription, Delio was issued her own prescription for oxycodone under **MAASSEN**'s DEA registration on February 18, 2021.

29.     Investigators have been able to establish a link between Delio and other patients of **MAASSEN** thru Delio's employment. According to the Pennsylvania Department of Labor and Industry, Delio was an employee of Loving Kindness Home Healthcare, which is a family owned and operated Limited Liability Company started by Copa Davis. The investigation has revealed that Gerald Davis, a relative of Copa Davis, has received prescriptions for oxycodone from **MAASSEN** since October 2019.

30.     Investigators obtained recorded calls between Gerald Davis and his son, Gerald Davis Jr., who is incarcerated at the Fayette County, PA Department of Corrections for Robbery. In a recorded call on December 22, 2020, Gerald Davis acknowledged that "D.L" had died, and described "D.L." as his "best friend". Gerald Davis also stated during the recorded call that "D.L." owed him "$8,500".

31.     In summary, "D.L." died on December 16, 2020; Gerald Davis learned of "D.L.'s" death prior to December 22, 2020; Davis Family employee, Delio, filled "D.L.'s" prescription on December 28, 2020; and then Delio began receiving oxycodone prescriptions in her own name from **MAASSEN** on February 18, 2021.

32.     This incident was not the first time Gerald Davis' name came to the attention of Investigators in this case. On September 24, 2020, two prescriptions were retrieved from the parking lot of **MEDICAL THERAPEUTICS**. Those two

prescriptions had been viewed by investigators lying on the ground next to the unattended registered vehicle of **MAASSEN**. The two prescriptions were made out to Gerald Davis. One of the prescriptions was for #150 oxycodone 30mg tablets and had been dated in advance for October 2, 2020.

33.     Investigators have identified Gerald Davis and his son, Graham Davis, as patients who have consistently been issued a range of quantity and dosages of oxycodone under **MAASSEN**'s DEA registration since March 2020. A third family member, Bijani Davis, recently received an oxycodone prescription in March 2021. Since March 2020, the Davis family has filled over 3,300 dosage units of oxycodone.

34.     Your Affiant subpoenaed data from Western Union which revealed one transaction on September 17, 2020 in which Gerald Davis sent $250 to **MAASSEN**, who retrieved the money in Conway, AR on September 19, 2020.

### D. Prescriptions Issued To MEDICAL THERAPEUTICS Staff

35.     Since January 2018 (approximately one year prior to changing his registered location to Pennsylvania), **MAASSEN** has been issuing controlled substance prescriptions to **KELLEY** and Bouchard. Since December 2018, **KELLEY** has consistently received monthly prescriptions for oxycodone 30mg. Since that time, **KELLEY** has filled over 4,600 dosage units of oxycodone 30mg. Bouchard primarily received monthly prescriptions for testosterone and alprazolam since November 2018; however, Bouchard was also issued prescriptions for #90 oxycodone 10mg on March 23, 2020 and #90 oxycodone 30mg on April 20, 2020.

36.     During **MAASSEN**'s encounter with Kentucky law enforcement in 2011, a prescription bottle for Gunther Than was found in **MAASSEN**'s possession. At that

time, **MAASSEN** identified Than as a business associate. Open-source internet searches revealed that Than is listed as the Chief Executive Director of View Systems, of which **MEDICAL THERAPEUTICS** is a subsidiary. Over the course of this investigation, Than has filled prescriptions issued under **MAASSEN**'s DEA Registration number in at least Pennsylvania, Maryland, and Arkansas. According to law enforcement database searches and open-source internet websites, Than is believed to be associated with real estate in Maryland, Arkansas, Colorado, Wisconsin, and also the address in Conway, AR where **MAASSEN** has resided since at least September 2020.

### E. Controlled Substance Prescription Analysis

37.     Over the course of this investigation, your Affiant has reviewed the Pennsylvania PDMP report for **MAASSEN** which has revealed that since January 2018, less than 5 percent of **MAASSEN**'s controlled substance prescribing has been attributed to steroid-type drugs, expected to be prescribed at male sexual health clinics. **MAASSEN** has issued over 1,600 controlled substance prescriptions (including Schedule III-V refills). Of those prescriptions, approximately 75% were issued for Schedule II narcotics; of those Schedule II narcotics prescriptions, approximately 92% (over 150,000 dosage units) were for oxycodone products (such as, oxycodone IR, oxycodone ER, OxyMorphone, OxyContin, etc.).

38.     As of April 8, 2021, **MAASSEN** has issued controlled substance prescriptions to 111 patients who filled their prescriptions in Pennsylvania; of those patients, 49 are believed to be female, and almost 40% of those receiving controlled substances have a drug or alcohol history (criminal or admitted addiction)[5]. **MAASSEN**

---

[5] If a patient did not have documented criminal history relating to drugs or alcohol, additional information was gleaned from local law enforcement reports of statements during encounters with law enforcement.

also consistently issues monthly prescriptions to patients for oxycodone 30mg in high quantities of #180 to #240 tablets.

## 1. High-Quantities of Opioid Prescriptions Issued

39.    Your Affiant is aware that in 2016, the Centers for Disease Control and Prevention's (CDC) published a "Guideline for Prescribing Opioids for Chronic Pain" (hereinafter "Guideline"). The Guideline provides recommendations for the prescribing of opioid pain medication "*by primary care clinicians for chronic pain (i.e., pain conditions that typically last > 3months or past the time of normal tissue healing) in outpatient settings outside of active cancer treatment, palliative care, and end-of-life care.*[6]" Within the Guideline, the CDC recommends that clinicians prescribe the lowest effective opioid dosage when a patient begins opioid therapy for chronic pain. Based on the review of PDMP data since 2014, for those 91 patients who received opiate prescriptions from **MAASSEN**, 14% (13) had never before received an opioid prescription. Of those 80 patients that *had* received an opioid prescription prior to **MAASSEN**, 49% (39) had very sporadic and small quantity (no more than two week duration) opioid prescriptions prior to **MAASSEN** issuing high quantity, monthly opioid prescriptions.

40.    The Guideline states "*Most experts agreed that, in general, increasing dosages to 50 or more MME/day increases overdose risk without necessarily adding benefits for pain control or function and that clinicians should carefully reassess evidence of individual benefits and risks when considering increasing opioid dosages to ≥ 50 MME/day.*" PDMP data for patients receiving opioids issued by **MAASSEN** showed

---

[6] Dowell D, Haegerich TM, Chou R. CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016. MMWR Recomm Rep 2016;65(No. RR-1):1-49. DOI: http://dx.doi.org/10.15585/mmwr.rr6501e1.

that of the 1,209 Schedule II narcotic prescriptions issued by **MAASSEN**, approximately 95% (1,151) were written at ≥ 50 Morphine Milligram Equivalents (MME) a day. The Guideline continued, "*Most experts also agreed that opioid dosages should not be increased to ≥ 90 MME/day without careful justification based on diagnosis and on individualized assessment of benefits and risks.*" PDMP data showed that 88% (1,064) of Schedule II narcotic prescriptions issued by **MAASSEN** were written at ≥ 90 MME/day, with several patients receiving prescriptions exceeding 500 MME/day.

### 2. Sporadic Increases in Quantity of Opioids

41.     Reference is made to paragraph 16 of this affidavit which recalled **MAASSEN**'s encounter with law enforcement during a traffic stop in which, according to the police report, **MAASSEN** admitted being addicted to the controlled substances in his possession and which he prescribed to his patients. **MAASSEN** essentially stated that he intentionally overprescribed to his patients. Investigators believe that **MAASSEN** overprescribed to his patients so that he could surreptitiously acquire the controlled substances for his own use. According to the PDMP, there were several occasions where patients of **MAASSEN** consistently received a certain quantity of controlled substances, but received random increases in quantity. Examples of this practice are listed below:

  a.  Patient "W.M." was issued prescriptions for both #180 oxycodone 30mg and #360 methadone 10mg on a monthly basis since April 2019. However, "W.M." was prescribed an additional #20 oxycodone 30mg and an additional #40 methadone 10mg each in February and March 2020.

  b.  Patient "D.B." was issued prescriptions for both #150 oxycodone

30mg and #60 OxyMorphone ER 40mg on a monthly basis since February 20, 2019. However, "D.B." was prescribed an additional #10 oxycodone 30mg each in February, and on March 3, and March 20, 2020. "D.B." was also prescribed an additional #30 OxyMorphone ER 40mg each in February, March, and December, 2020.

    c.   Gerald Davis was issued prescriptions for #120 oxycodone 30mg on a monthly basis from November 2019 thru September 2020; however Davis was prescribed an additional #10 oxycodone 30mg in February and March 2020, and an additional #30 oxycodone 30mg in July 2020. In addition, Davis began receiving additional prescriptions for #120 oxycodone 15mg on a monthly basis since May 2020. Davis was prescribed an additional #30 oxycodone 15mg in October 2020.

    d.   Patient "L.H." was issued prescriptions for #120 oxycodone 20mg on a monthly basis from June 2020 thru February 2021; however, "L.H." was prescribed an additional #60 oxycodone 20mg each in November and December 2020 and January 2021.

**3. Opioid Prescriptions Issued to Family Groups**

42.    The aforementioned Davis family is not the only family group to which **MAASSEN** prescribes oxycodone. Through the course of analyzing PDMP data, Investigators have identified at least three additional distinct familial groups of patients based on shared addresses and open-source internet websites. While familial groupings of patients may not be uncommon at primary care offices, this finding for a specialty office *may* be indicative of illegitimate prescribing.

a.  The "A" family group has two members consistently issued #120 oxycodone 20mg since March 2020. A third family member has received two #120 oxycodone 20mg prescriptions in September and November 2020 and one #120 oxycodone 10mg prescription in December 2020. Since March 2020, the "A" family has filled over 3,400 dosage units of oxycodone products.

b.  The "F" family group has four members consistently issued a range of quantity and dosages of oxycodone since early 2019. Since March 2020, the "F" family group has filled over 13,400 dosage units of oxycodone products.

c.  The "Y" family group has four members; two of which started consistently receiving #180 oxycodone 10mg prescriptions in February 2020. In August 2020 a third member began consistently receiving #120 oxycodone 20mg prescriptions, and in December of 2020 a fourth began receiving monthly prescriptions for #60 or #90 oxycodone 10mg prescriptions. Since March 2020, the "Y" family group has filled over 5,700 dosage units of oxycodone products.

43.    On October 26, 2020, a police department in Allegheny County executed an unrelated search warrant at the residence of an 18 year old male. During the search, an empty prescription bottle for #180 oxycodone 10mg tablets was found. The patient name section had been ripped off from the label; however, the prescription number identified the bottle as prescribed by **MAASSEN** to "E.K.", a member of the aforementioned "Y" family group with no clear ties to the residence where the bottle was retrieved, nor the 18

year old male who had possession of the bottle.

### 4. Concurrent Use of Opioids and Benzodiazepines

44.     Your Affiant is aware that the Guideline warns clinicians to avoid prescribing both opioids and benzodiazepines, as, "*concurrent use is likely to put patients at greater risk for potentially fatal overdose.*" Based on the review of PDMP data since 2014, for those patients who received opioid prescriptions from **MAASSEN**, 22% (20) had been prescribed both opioids and benzodiazepines. The Guideline cites that both drugs "*cause central nervous system depression and can decrease respiratory drive."*

### F. Issuance Of Controlled Substance Prescriptions

45.     During the course of this investigation, **MAASSEN** has utilized paper prescriptions which are required to be signed and dated on the date issued to the patient (Title 21, C.F.R., Section 1306.05). In addition, the issuance of paper prescriptions causes the patient (or an associate) to physically retrieve the paper prescription from **MEDICAL THERAPEUTICS** staff. Per Act 96 of 2018, the Commonwealth of Pennsylvania required all practitioners to issue prescriptions for Schedule II-V controlled substances electronically.[7] While promulgating regulations, the Commonwealth accepted petitions for temporary exemptions from the requirements to solely issue electronic prescriptions. This "Temporary Exemption Form" is available on the Pennsylvania Department of Health (PA DOH) website. According to the PA DOH Director of the Office of Drug Surveillance and Misuse Prevention, **MAASSEN** electronically submitted a temporary exemption to Act 96 of 2018 on November 14, 2019. **MAASSEN** cited "economic hardship" and "technical limitations" as reasons for requesting the exemption.

---

[7] According to the Pennsylvania Department of Health website, Act 96 of 2018's Electronic Prescribing of Controlled Subtances "*has the potential to minimize medication errors for patients, and reduce prescription forgery, diversion, and theft.*"

**MAASSEN** further explained by entering the following on the electronic form, "I only have about 10 patients for whom I prescribe Schedule Drugs, so having to buy an [Electronic Health Record] would not be cost effective." Temporary exemptions are valid for one year; **MAASSEN**'s exemption expired in November 2020.

46.     Electronic surveillance conducted at the Jonnet Building and LPR data, in comparison with PDMP data have corroborated that prescriptions are issued to patients in the absence of **MAASSEN**:

a.      On September 21, 2020 **KELLEY** was captured on recorded surveillance handing patient "T.W." a prescription sized piece of paper on the front steps of the building. PDMP records later reflected that "T.W." was issued a prescription for #120 oxycodone 20mg tablets on September 21, 2020. **MAASSEN** was not captured on surveillance at the medical clinic on September 21, 2020, nor was his vehicle in the area according to LPR data.

b.      On October 2, 2020, patient "M.S." arrived in the parking lot of the Jonnet Building at approximately 11:54 AM. According to toll records of the **KELLEY PHONE**, **KELLEY**, who was seen at the clinic placed a phone call to **MAASSEN** around the same time of the arrival of "M.S." which lasted approximately 8 minutes. At approximately 12:14 PM, "M.S." exited the building and departed the parking lot in his/her registered vehicle. According to the PDMP, "M.S." was issued a prescription for #120 oxycodone 15mg tablets on October 4, 2020. It is believed that **KELLEY** provided "M.S." with a hand-written prescription dated as written and issued on October 4, 2020. **MAASSEN** was not captured on surveillance at the medical clinic on October 2, 2020 or October 4, 2020, nor was his vehicle in the area according to LPR data.

c.      On October 21, 2020, both **KELLEY** and Bouchard were seen arriving at the clinic location at approximately 11:58 AM. At approximately 1:08 PM, a blue Chevrolet Malibu entered the parking lot and patient "T.W." exited the vehicle and entered the building. At approximately 1:45 PM,

"T.W." exited the building holding a prescription sized piece of paper. PDMP records later indicated that "T.W." received a prescription written on October 21, 2020 for #120 oxycodone 20mg tablets. **MAASSEN** was not captured on surveillance at the medical clinic on October 21, 2020, nor was his vehicle in the area according to LPR data.

47.     Since September 2020, over 350 oxycodone prescriptions (over 48,000 dosage units) have been issued to patients on dates where "ping" data and electronic surveillance and LPR data show **MAASSEN** was not at the clinic, or even in the Commonwealth.

### G. Federal Health Insurance Payments

48.     On several occasions throughout this investigation, your Affiant has queried the OIG HHS for federal health care benefit program billings reported under **MAASSEN**'s National Provider Identifier (NPI) number. According to those queries, from January 1, 2018 to March 2, 2021, **MAASSEN**'s patients who were covered under a health care benefit program utilized their federal health insurance to pay for their controlled substance prescriptions at the pharmacy. However, there were no billings for office visits or testing (such as laboratory testing, imaging such as X-Rays or MRI's, etc.).

49.     The aforementioned Guideline on opioid prescribing states, "*Experts agreed that prior to starting opioids for chronic pain and periodically during opioid therapy, clinicians should use urine drug testing to assess for prescribed opioids as well as other controlled substances and illicit drugs that increase risk for overdose when combined with opioids, including nonprescribed opioids, benzodiazepines, and heroin.*"

### H. Income of MEDICAL THERAPEUTICS Staff

50.     Over the course of this investigation, your Affiant has queried the

Pennsylvania Department of Labor and Industry data to determine the income of **MEDICAL THERAPEUTICS** employees reported to the Commonwealth of Pennsylvania. To date, neither **MAASSEN**, **KELLEY**, nor Bouchard have had any income reported to Pennsylvania in relation to **MEDICAL THERAPEUTICS**. Specifically, **MAASSEN** has no income reported to Pennsylvania.

## V. PROBABLE CAUSE AS TO TARGET LOCATION 1 – MEDICAL THERAPEUTICS

51.     Pursuant to Title 21, U.S.C., Section 827 and Title 21, C.F.R., Section 1301.01, et seq., **TARGET LOCATION 1** (**MEDICAL THERAPEUTICS**), is described as a controlled premises within the meaning of Title 21, U.S.C., Section 880(a) and Title 21, C.F.R., Section 1316.02(c)(1) and (2), is required to keep on the premises complete and accurate records of all controlled substances dispensed, manufactured, received, sold, delivered or otherwise disposed.

### A. Seizure of Computer And Smart Phone Equipment And Data

52.     Through my training and experience and consultation with other Investigators, I have learned that information which practitioners are required to maintain is commonly stored in an electronic form on a storage medium.  A storage medium can be defined as any physical object upon which information can be stored in an electronic format.  Examples of storage media include computer hard drives, removable digital media (e.g., external drives, CD/DVD disks, flash memory cards and drives, computer tapes, etc.), smart phones (e.g., iPhones, Android phones, Blackberries, etc.), tablets (e.g., iPads and Android Tablets), scanners, photocopiers, fax machines, digital camera storage cards, USB drives, and computerized gaming systems (e.g., Xbox, Playstations, Wii, etc).

53.     As described above and in ATTACHMENT 1-A, this application seeks permission to search for records that might be found at **TARGET LOCATION 1** in whatever form they are found.  One form in which the records might be found is data stored on storage media.  Thus, the warrant applied for would authorize the seizure of storage media including computer hard drives or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure, Section 41(e)(2)(B).

54.     I submit that if a storage medium is found at the search locations, there is probable cause to believe that records, including but not limited to health care records, prescriptions, medication log books, financial records, billing records, communications, business receipts and expenditures will be stored on that storage medium for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using forensic tools.  This is due to the fact that when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.  I am aware that computers are often used to generate, store, and print documents

related to patient files, invoices and controlled substance prescriptions issued at medical offices. Based on evidence related to this investigation, there is reason to believe that computers are at **TARGET LOCATION 1** due to the fact that **MEDICAL THERAPEUTICS** operates an internet website, offers **MAASSEN's** e-mail address for patient contact, and has offered online booking to patients. In addition, on July 11, 2019, during a recorded call with "J.P.", Kelley indicated he was with "Comcast" and the modems[8] were not working at the office.

55.    As further described in ATTACHMENT 1-A, this application seeks permission to locate not only information stored on storage media that might serve as evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.

56.    In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

>    a.    The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used,

---

[8] A Modem is a device that allows one to access the internet and cable services from electronic devices.

what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

57.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

58.    If, after inspecting a seized storage medium, the agents and computer analysts determine that these items are no longer necessary to retrieve and preserve electronic evidence, and the prosecutor determines that they need not be preserved as evidence, fruits or instrumentalities of a crime, and these items do not contain contraband, they should be returned within a reasonable time, upon written request, if the

party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevance or admissibility) for evidentiary purposes.

59.     If the storage medium cannot be returned, agents should, upon written request, make available to the storage medium's owner, within a reasonable time period after the execution of the warrant, copies of files that are neither the fruits nor instrumentalities of crime nor contraband.

60.     To the extent practicable and appropriate, agents will copy or "image" data, rather than physically seize storage media, to reduce the extent of disruption. Generally speaking, "imaging" is the taking of a complete electronic picture of a storage medium's data, including all files, hidden sectors, and deleted files.  Imaging a storage medium permits agents to obtain an exact copy of the stored data without actually seizing the storage medium.  Agents can then conduct an off-site search from the "mirror image" copy of the data at a later date.-

61.     If "imaging" proves impractical or even impossible for technical reasons, agents will seize those components of the storage medium that they believe must be seized to permit the agents to locate the items described in ATTACHMENT 1-A at an off-site location.

## B. Conclusion Regarding Probable Cause As To TARGET LOCATION 1 – Medical Therapeutics

62.     Based on the allegations and information set forth in this Affidavit, your affiant has probable cause to believe that the documents and items are described in ATTACHMENT 1-A maintained at the premises identified as **TARGET LOCATION 1** (**MEDICAL THERAPEUTICS**), curtilage and potential safe located therein, all of

which constitute evidence, fruits and instrumentalities of the crimes of violations of Title 21, U.S.C., Sections 841(a)(1), and 846 (illegal drug distribution and conspiracy).

## VI. PROBABLE CAUSE AS TO MAASSEN'S AND KELLEY'S CELLULAR TELEPHONES

63.     Because of the usefulness, convenience and portability of personal cellular telephones, your Affiant knows that people who own and regularly use personal cellular telephones normally possess and carry their cellular telephones with them, especially when they are away from home. As set forth in detail above and below, both **MAASSEN** and **KELLEY** frequently use their respective cellular telephones. Therefore, your Affiant submits that there is probable cause to believe that, at any given time during the hours for which the requested search warrants would be authorized, **MAASSEN** and **KELLEY** will be in possession of their cellular telephones.

64.     According to subscriber and toll data, the **MAASSEN PHONE** is an Apple IPhone 11 Pro, bearing IMSI 310410227107884; serviced by AT&T Wireless with the current number of 765-491-1422. The phone is subscribed to **MAASSEN** currently at 110 Beaverfork Rd., Conway, AR 72032. Associated with his account is an e-mail address of martin.maassen@gmail.com. This account has been opened since January 30, 1997. This cellular telephone number was provided as a cellular telephone number on **MAASSEN**'s DEA Registration. Additionally, this number has been provided as **MAASSEN**'s cellular telephone number by **MEDICAL THERAPEUTICS** to Registered Pharmacists when **MAASSEN** was unreachable at the clinic. Investigators have requested toll data from November 1, 2019 to April 25, 2021 (either by

administrative subpoena or federal court ordered pen register[9].)

65.     According to subscriber and toll data, the **KELLEY PHONE** is an Android ZTE Z965 cellular telephone, bearing IMSI: 310150708663327; serviced by AT&T Wireless under pre-paid account number 487381727, with the current number of 412-853-2486. The phone is subscribed to "Steven Muran" at "201 Wilbur St., Mount Oliver, PA 15210[10]." This pre-paid account was transferred from Cricket to AT&T Wireless on August 9, 2015. The **KELLEY PHONE** has been provided on rental receipts for **KELLEY**'s Enterprise rental vehicles; additionally **KELLEY** used this cellular telephone to communicate on recorded lines for Westmoreland County Jail. Investigators have requested toll data from January 1, 2019 to April 25, 2021 (either by administrative subpoena or federal court ordered pen register.[11])

66.     Due to **MAASSEN**'s apparently frequent and continued absence from the clinic, and **KELLEY**'s handling of patients at **MEDICAL THERAPEUTICS**, Investigators believe that primary communications between **MAASSEN**, **KELLEY**, other business associates, and patients occur on the **MAASSEN PHONE** and the **KELLEY PHONE**.

67.     On March 5, 2021, Investigators applied for and were granted court ordered authorization to serve a search warrant on AT&T Wireless for the preserved SMS/MMS/text message content for the **MAASSEN PHONE** and the **KELLEY PHONE**, filed under Magistrate 21-mj-477 and 21-mj-478, respectively.

---

[9] On October 23, 2020 and December 21, 2020, Investigators were authorized via federal court order to acquire toll data for the **MAASSEN PHONE** via pen register at Magistrate No. 20-mj-2141 and 20-mj-2141(a), respectfully.

[10] According to Google Maps and the Allegheny County Real Estate Website, this address is vacant land.

[11] On October 23, 2020 and December 21, 2020, Investigators were authorized via federal court order to acquire toll data for the **KELLEY PHONE** via pen register at Magistrate No. 20-mj-2142 and 20-mj-2142(a), respectfully.

68.     On March 16, 2021 AT&T Wireless sent data in response to the search warrant. Applicable portions of those data sets are included in the toll analysis of the **MAASEN PHONE** and the **KELLEY PHONE** in the following section. Overall toll analysis shows that the **MAASSEN PHONE**'s top contact is the **KELLEY PHONE**, with approximately 3,593 contacts since November 2019 and most recently on April 25, 2021.

69.     According to the PDMP, "P.F." and "A.F." (believed to be father and son) have received monthly prescriptions issued by **MAASSEN** for oxycodone for approximately two years. In the last year, "P.F." has received monthly prescriptions for #200 oxycodone 30mg and #60 oxycodone 20mg, while "A.F." has received monthly prescriptions for #160 oxycodone 30mg and #60 oxycodone 20mg. From December 16, 2020 to April 15, 2021, the **MAASSEN PHONE** contacted/was contacted by a cellular telephone subscribed to "P.F." approximately 388 times, of which 121 (32%) were via text message. The most recent telephonic contact was April 19, 2021; the most recent oxycodone prescription for "P.F." was purportedly issued on February 6, 2021. From January 12, 2020 to April 25, 2021, the **MAASSEN PHONE** contacted/was contacted by a cellular telephone with the customer name, "A.F." approximately 111 times, of which 59 (53 %) were via text message. The most recent telephonic contact with "A.F." was on April 21, 2021; the most recent oxycodone prescription issued to "A.F." was purportedly written on April 1, 2021.

70.     According to the PDMP, "D.M" and "E.P" (believed to be D.M.'s significant other), have received prescriptions for controlled substances from **MAASSEN**. "D.M" received prescriptions in July, August and December 2020 for

buprenorphine, a drug often prescribed for substance abuse and which requires a special designation by the Department of Health and Human Services and a unique identifying number from the DEA, neither of which **MAASSEN** has. "E.P." has received monthly prescriptions for oxycodone since January 2019, most recently #180 oxycodone 30mg. Additionally, according to a pharmacist complaint, "E.P" was pregnant and gave birth in September 2020, all the while receiving monthly prescriptions for oxycodone 30mg. "E.P." also has received prescriptions for alprazolam and phentermine from **MAASSEN** before, during, and after her alleged pregnancy. From April 29, 2020 to April 25, 2021, the **MAASSEN PHONE** contacted/was contacted by a cellular telephone subscribed to "D.M" approximately 336 times; of which 281 (84%) were via text message. Numerous communications occurred late in the evening or outside normal business hours for the medical practice. As part of the return of preserved text messages from AT&T Wireless, an incoming text message from "D.M." was captured from December 16, 2020 which was a "google search" of "Pharmacy in WestView PA" purportedly conducted by "D.M." and then shared via text message with **MAASSEN** on the **MAASSEN PHONE**. Investigators believe "D.M." was providing **MAASSEN** with additional pharmacies in the area due to the fact that some pharmacies were refusing to fill **MAASSEN**'s controlled substance prescriptions. The last contact with "D.M." occurred on April 24, 2021; the most recent oxycodone prescription was received for "E.M." purportedly written on March 29, 2021.

71.    According to the PDMP, "M.M." has primarily received monthly prescriptions issued by **MAASSEN** for #180 oxycodone 20mg since June 9, 2020, all of which were paid in-cash.  From July 2, 2020 to April 25, 2021, the **MAASSEN PHONE**

contacted/was contacted by a cellular telephone subscribed to "M.M" approximately 224 times, of which 172 (77 %) were via text message. Numerous communications occurred late in the evening or outside normal business hours for the medical practice. As part of the return of preserved text messages from AT&T Wireless, an outgoing text message from the **MAASSEN PHONE** to "M.M." was captured from December 16, 2020 which stated, "Oh yes, [*patient first name*] I just talked to them and they are shipping it today, and you should get it by Friday so again I'm sorry for the delay but let me know when". The most recent telephonic contact with "M.M." occurred on March 12, 2021; the most recent oxycodone prescription received for "M.M." was purportedly written on April 7, 2021.

72.     According to the PDMP, "R.A." received controlled substance prescriptions issued by **MAASSEN** for oxycodone, most recently #120 oxycodone 20mg. From November 22, 2020 to April 25, 2021, the **MAASSEN PHONE** contacted/was contacted by a cellular telephone subscribed to "R.A." approximately 72 times, of which 33 (46 %) were via text message. Numerous communications occurred late in the evening or outside normal business hours for the medical practice. The most recent telephonic contact with "R.A." occurred on February 12, 2021; the most recent oxycodone prescription received for "R.A." was purportedly written on March 16, 2021.

73.     According to the PDMP, "C.A." and "L.A." and "A.A." (believed to be brother, sister, and mother) have collectively received oxycodone prescriptions issued by **MAASSEN** since October 2019. From March 2, 2020 to April 25, 2021, the **MAASSEN PHONE** contacted/was contacted by a cellular telephone subscribed to "C.A." approximately 161 times, of which 34 (21%) were via text message. The most recent

telephonic contact was March 31, 2021; the most recent oxycodone prescription for "C.A." was purportedly issued on March 20, 2021. From September 28, 2020 to April 25, 2021, the **MAASSEN PHONE** contacted/was contacted by a cellular telephone with the customer name, "L.F." approximately 41 times, of which 15 (37 %) were via text message. The most recent telephonic contact with "L.A." was on January 14, 2021; the most recent oxycodone prescription issued to "A.A." was purportedly written on December 11, 2020. Additionally, the most recent oxycodone prescription issued to "A.A." was purportedly written on March 17, 2021.

74.     According to the PDMP, "L.H." has received controlled substance prescriptions issued by **MAASSEN** for oxycodone, most recently #120 oxycodone 20mg. From September 22, 2020 to April 25, 2021, the **MAASSEN PHONE** contacted/was contacted by a cellular telephone subscribed to "L.H." approximately 44 times, of which 19 (43 %) were via text message. Several communications occurred late in the evening or outside normal business hours for the medical practice. The last telephonic contact occurred on April 20, 2021; the most recent oxycodone prescription issued to "L.H." was purportedly written on March 27, 2021.

75.     According to the PDMP, "L.P." has received controlled substance prescriptions issued by **MAASSEN** for oxycodone, most recently #120 oxycodone 20mg. From August 15, 2020 to April 25, 2021, the **MAASSEN PHONE** contacted/was contacted by a cellular telephone subscribed to "L.H." approximately 42  times, of which 2 (5 %) were via text message. Several communications occurred late in the evening or outside normal business hours for the medical practice. The last telephonic contact occurred on April 7, 2021; the most recent oxycodone prescription issued to "L.H." was

purportedly written on March 13, 2021.

76.    According to the PDMP, "J.Y." received monthly prescriptions issued by **MAASSEN** for #180 oxycodone 10mg since February 2020. From January 30, 2019 to April 25, 2021, the **KELLEY PHONE** contacted/was contacted by a cellular telephone subscribed to "J.Y." approximately 503 times, of which 330 (66 %) were via text message. The last telephonic contact occurred on April 20, 2021. It should also be noted that three individuals believed to be family members of "J.Y." also received monthly oxycodone prescriptions issued by **MAASSEN;** the most recent oxycodone prescription issued to "J.Y." was purportedly written on March 13, 2021. Numerous communications occurred late in the evening or outside normal business hours for the medical practice.

77.    According to the PDMP, "T.F." received a controlled substance prescription for zolpidem in April 2019 issued by **MAASSEN**. From January 1, 2019 to April 25, 2021, the **KELLEY PHONE** contacted/was contacted by a cellular telephone subscribed to "M.F.", believed to be the  spouse of patient "T.F." approximately 473 times, of which 186 (39 %) were via text message. The last telephonic contact occurred on April 9, 2021. Numerous communications occurred late in the evening or outside normal business hours for the medical practice.

78.    According to the PDMP, "M.C." received controlled substance prescriptions issued by **MAASSEN** for testosterone since August 2019. From January 25, 2019 to April 25, 2021, the **KELLEY PHONE** contacted/was contacted by a cellular telephone subscribed to "M.C." approximately 683 times, of which 598 (88 %)  were via text message. The last telephonic contact occurred on April 18, 2021. Numerous communications occurred late in the evening or outside normal business hours for the

medical practice.

## Conclusion Regarding Probable Cause For The Searches Of MAASSEN, KELLEY And Their Cellular Telephones

79.     Based upon the allegations and information contained in the Affidavit, your Affiant has probable cause to believe that in the Western District of Pennsylvania, from January 1, 2018, and continuing to the present, **MAASSEN**, **KELLEY**, and others have committed, and have continued to commit, the crimes of distribution of controlled substances, and conspiracy to distribute controlled substances, in violation of Title 21, U.S.C., Sections 841(a)(1) and 846, and that evidence of those offenses will be found on the persons of **MAASSEN** and **KELLEY**, and in their cellular telephones.

The above information is true and correct to the best of my knowledge, information and belief.

                       */s/Whitney A. Seka*
                       Whitney A. Seka
                       Diversion Investigator
                       Drug Enforcement Administration

Sworn and subscribed before me,
this 28th day of April, 2021.

_____
HONORABLE CYNTHIA R. EDDY
Chief United States Magistrate Judge

## <u>ATTACHMENT 1</u>
## PROPERTY TO BE SEARCHED:

This warrant applies to the business premises of Medical Therapeutics located at 4099 William Penn Highway, Suite 810, Monroeville, PA 15146. This is Medical Therapeutics' sole place of business, and Dr. Martin Maassen's registered location, which is considered a controlled premises within the meaning of Title 21, United States Code, Section 880(a) and Title 21, C.F.R., Section 1316.02 (1) and (2). Medical Therapeutics is a medical practice within the Jonnet Building, 10-story general office building constructed of brown brick. Medical Therapeutics is located on the northwest corner of the eighth floor within the Jonnet Building. There are two entrances to the parking lot which are located off William Penn Highway and Center Road. Furthermore, there are two double glass automatic entry doors for public access to the Jonnet Building.




## ATTACHMENT 1-A

a.  Prescriptions;

b.  Patient information, files, records and ledgers reflecting any corresponding medical purpose for said prescriptions;

c.  Records and documents relating to the purchase, dispensation, administration, prescription, distribution, destruction, or the theft/loss of controlled substances required to be maintained pursuant to Title 21, C.F.R., Section 1300 et seq.; records reflecting any inventories of controlled substances;

d.  Billing records, claims, claim forms, office fee slips, cash, and checks reflecting prescriptions and billings;

e.  Business records, including books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances or reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

f.  Addresses and/or telephone books, rolodex, indices, and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, and/or telex numbers of employees, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

g.  Cash, currency, property and items that constitute the proceeds of the illegal sale and/or distribution of drugs, such as United States and/or foreign currency; gems and precious metals, valuable jewelry, artwork, collectibles, and/or antiques; and/or financial instruments, stocks and/or bonds;

h.  Books, records and/or items evidencing the obtaining, secreting, concealment, transfer, and/or expenditure of proceeds generated from the illegal distribution and/or sale of drugs, such as bank and/or financial statements and related records (deposit slips, wire transfer records, withdrawal slips, canceled checks, passbooks, money drafts, letters of credit, money orders and/or cashier checks for any and all bank, financial and/or investment accounts); receipts; bills; invoices; documents related to asset purchase and/or ownership; bank safety deposit box records and keys; settlement sheets; closing statements; sales agreements; investment agreements; partnership agreements; and/or trust agreements; records relating to the sale/purchase of  automobiles, to include bills of sale, invoices, titles for vehicles, car insurance documents and other related documents; promissory notes, payment records, papers and computer files relating to loans.

i.   Items of personal property that tend to identify Dr. Martin MAASSEN, William KELLEY or any other(s) affiliated with MEDICAL THERAPEUTICS in occupancy, control, or ownership of the premises that is the subject of this warrant, such as canceled mail, deeds, leases, rental agreements, photographs, telephone books, utility and telephone bills, statements, identification documents, and keys;

j.   Photographs, including still photos, negatives, video tapes, slides, films, undeveloped film and the contents therein, to include photographs, in hard copy or computerized format.

k.   Computer hardware, consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Examples of computer hardware include any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, smart phones, memory facsimile machines and "schedulers"); internal and periperal storage devices (such as file servers, fixed disks, external hard drives, floppy disk drives and diskettes, USB storage devices, optical storage devices, transistor-like binary devices, read/write CD and DVD devices, and any and all storage devices); peripheral input/output devices (such as keyboards, printers, scanners, video display monitors, mouse devices); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks);

l.   Computer software, consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, networking, graphics, accounting, presentations or spreadsheet programs), utilities, compilers, interpreters, and communications program; and

m.   Computer passwords and other data security devices, that is, a string of alphanumeric characters designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programmable code. A password usually operates as a sort of digital key to "unlock" particular storage data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, destroy or "booby-trap" protected

data to make it inaccessible or unusable, as well as reverse the process to restore it.

n.  For any computer hardware, computer software, or computer passwords that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    i.  Evidence of who used, owned, or controlled the computer hardware, computer software, or computer passwords at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    ii.  Evidence of software that would allow others to control the computer hardware, computer software, or computer passwords, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii.  Evidence of the lack of such malicious software;

    iv.  Evidence of the ATTACHMENT to computer hardware, computer software, or computer passwords of other storage devices or similar containers for electronic evidence;

    v.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer hardware, computer software, or computer passwords;

    vi.  Evidence of the times the computer hardware, computer software, or computer passwords was used;

    vii.  Passwords, encryption keys, and other access devices that may be necessary to access the computer hardware, computer software, or computer passwords;

    viii.  Documentation and manuals that may be necessary to access the computer hardware, computer software, or computer passwords or to conduct a forensic examination of the computer hardware, computer software, or computer passwords;

    ix.  Contextual information necessary to understand the evidence described in this ATTACHMENT.

o.  Evidence of user attribution, showing who used or owned the Devices at the time including, but not limited to, logs, phonebooks, saved usernames and passwords, documents and browsing history and when they were created, edited or deleted;

p.  Records evidencing the use of the Internet to communicate via email, social media websites, including Facebook and Facebook Messenger, or other electronic means, regarding customer purchases, shipments, financial transactions, including but not limited to: (1) records of Internet Protocol addresses used; and (2) records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

q.  All data files, including but not limited to, records and graphic representations, containing matter pertaining to the distribution of controlled substances, that is, documents and visual depictions of accounting records, websites, marketing and facilitating records;

r.  Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange Formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to the possession and distribution of controlled substances, the unlawful use of a communications devices to commit and facilitate the commission of drug trafficking offenses, and drug trafficking conspiracies;

s.  Any SIM card located within the Devices that helps to identify the cellular telephone number(s) associated with the Devices;

t.  Electronic mail, chat logs, Internet Relay Chat (IRC) log files and electronic messages; log files and other records concerning dates and times of connection to the Internet and to websites pertaining to violations of Title 21, U.S.C., Sections 841(a)(1), 843(b) and 846), Title 18, U.S.C., Sections 1347 and 1349; and Title 21, U.S.C., Sections 331.

u.  GPS navigational data related to the geographic locations of the Devices at various points in time.

v.  Any controlled substances unless legitimately prescribed to an ultimate user/patient.

**ATTACHMENT 2**
**PERSON TO BE SEARCHED:**

This warrant applies to the person of Martin J. Maassen, who is described as a white, male, DOB: 8/29/1942, 6'0", gray hair, brown eyes. Dr. Maassen is licensed in the Commonwealth of Pennsylvania as a Medical Physician and Surgeon under license number MD440320, expiration date December 31, 2022; this license was first issued on June 17, 2010. Dr. Maassen further holds registration with the Drug Enforcement Administration under registration number AM8223911, expiration date January 31, 2023.



**ATTACHMENT 2-A**

Apple IPhone 11 PRO, bearing IMSI 310410227107884.

This is the cellular telephone of Dr. Martin Maassen.

## ATTACHMENT 3

**PERSON TO BE SEARCHED:**

This warrant applies to the person of William Kelley, who is described as a white, male, DOB: 9/23/1960, 6'04", gray hair, hazel eyes. Kelley is the Managing Director for Medical Therapeutics. Kelley is not medically licensed in the Commonwealth of Pennsylvania.



## **ATTACHMENT 3-A**

Android ZTE Z965 Cellular Telephone, bearing IMSI 310150708663327.

This is the cellular telephone of William Kelley.

## **ATTACHMENT 4**

Apple IPhone 11 PRO, bearing IMSI 310410227107884.

This is the cellular telephone of Dr. Martin Maassen.

**ATTACHMENT 4-A**
**ITEMS TO BE SEIZED**

1.    This warrant applies to all records, information, and items evidencing who used the devices and/or when and/or from where, or a violation Title 21, United States Code, Sections 841(a)(i) and 846, including:

       a.    incoming and outgoing call and text message logs
       b.    contact lists
       c.    photo and video galleries
       d.    sent and received text messages
       e.    online searches and sites viewed via the internet
       f.    online or electronic communications sent and received, including email, chat, and instant messages
       g.    sent and received audio files
       h.    navigation, mapping, and GPS files
       i.    telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN for the telephone
       j.    call forwarding information
       k.    messages drafted but not sent
       l.    voice messages

2.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  However, no real-time communications will be intercepted and searched during service.

## **ATTACHMENT 5**

Android ZTE Z965 Cellular Telephone, bearing IMSI 310150708663327.

This is the cellular telephone of William Kelley.

**ATTACHMENT 5-A**
**ITEMS TO BE SEIZED**

1.      This warrant applies to all records, information, and items evidencing who used

the devices and/or when and/or from where, or a violation Title 21, United States Code,

Sections 841(a)(i)  and 846, including:

       a.   incoming and outgoing call and text message logs
       b.   contact lists
       c.   photo and video galleries
       d.   sent and received text messages
       e.   online searches and sites viewed via the internet
       f.   online or electronic communications sent and received, including email,
            chat, and instant messages
       g.   sent and received audio files
       h.   navigation, mapping, and GPS files
       i.   telephone settings, including speed dial numbers and the telephone
            number for the subject telephone and related identifying information such
            as the ESN for the telephone
       j.   call forwarding information
       k.   messages drafted but not sent
       l.   voice messages

2.      As used above, the terms "records" and "information" include all of the foregoing

items of evidence in whatever form and by whatever means they may have been created

or stored, including any form of computer or electronic storage (such as flash memory or

other media that can store data) and any photographic form.  However, no real-time

communications will be intercepted and searched during service.